# EXHIBIT A

Electronically Filed by Superior Court of California, County of Orange, 09/29/2021 03:53:00 PM.
30-2021-01223810-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Arlene Gill, Deputy Clerk.
Case 8:21-cv-01807 Document 1-2 Filed 11/01/21 Page 2 of 42 Page ID #:9

1  MARK M. HATHAWAY
2  (CA 151332; DC 437335; IL 6327924; NY 2431682)
   JENNA E. PARKER (CA 303560)
3  HATHAWAY PARKER
   445 S. Figueroa St. 31st Fl
4  Los Angeles, California 90071
   Telephone: (213) 529-9000
5  Facsimile: (213) 529-0783
   E-Mail: mark@hathawayparker.com
6  E-Mail: jenna@hathawayparker.com
7
   Attorneys for Plaintiff John Doe
8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                                        Assigned for All Purposes
                 FOR THE COUNTY OF ORANGE      Judge Fred W. Slaughter
11
12  JOHN DOE, an individual,            )  Case No.: 30-2021-01223810-CU-BC-CJC
                                        )
         Plaintiff,                     )
13                                      )  **COMPLAINT FOR DAMAGES**
    v.                                  )
14                                      )    1) BREACH OF CONTRACT AND
    REGENTS OF THE UNIVERSITY OF        )       COVENANT OF GOOD FAITH AND
15  CALIFORNIA, a California corporation; and )   FAIR DEALING
    DOES 1 to 50 inclusive,             )    2) PROMISSORY ESTOPPEL
16                                      )    3) TITLE IX
         Defendants.                    )    4) VIOLATION OF CALIFORNIA CIVIL
17                                      )       CODE, § 51
                                        )    5) NEGLIGENCE
18                                      )
                                        )  JURY DEMAND
19  _____)

20

21      COMES NOW PLAINTIFF John Doe ("Plaintiff"), by and through his attorneys Hathaway Parker

22  Inc., as and for his Complaint, respectfully alleges as follows:

23                           **NATURE OF THIS ACTION**

24      1.  In February 2016 Plaintiff John Doe, a graduate student, had the misfortune of being among the

25  very first accused male University of California students targeted and investigated under the

26  University's new Sexual Violence and Sexual Harassment Policy ("SVSH policy"), effective January 1,

27  2016.  The University initiated at least six investigations and administrative proceedings against Plaintiff

28  for allegations of misconduct including stalking, computer hacking, research sabotage, and research

─────────────────────────────────────────
COMPLAINT FOR DAMAGES
1

misconduct, none of which investigations ultimately succeeded in finding that Plaintiff violated any University policies, rules, or regulations.  The University has also used their own police department to surveil Plaintiff, installing surveillance cameras in his workspace, but then refused to provide any of the surveillance footage during Regents' lengthy administrative proceedings against Plaintiff.

2.   For three years, Plaintiff was improperly subjected to a series of misconduct investigations by Defendants under the guise of a Title IX misconduct disciplinary process that was unfair, lacked due process, did not comply with the law or university policy, and where the charges were not supported by the evidence.

3.   Plaintiff successfully exhausted his administrative remedies and judicial review through a writ of mandate under Code Civ. Proc., § 1094.5 and, thereafter, Regents ultimately stopped the investigations and took no further administrative action against Plaintiff.

4.   John Doe brings this complaint, as he has been subject to discrimination as result of his gender/sex and ethnic background, suffered violations of his right to due process, intentional infliction of emotional distress, and breach of contract by Defendants.

5.   Plaintiff brings this action not only for his own interest, but to protect the rights of other individuals and students who have been subjected to wrongful and unfair disciplinary proceedings at the University of California.

## **THE PARTIES**

6.   Plaintiff JOHN DOE was, at all times relevant, a graduate student at the University of California, Irvine ("UC Irvine" or "UCI").

7.   Respondent REGENTS OF THE UNIVERSITY OF CALIFORNIA (hereinafter "University of California" or "Regents"), is the official name of the public corporation that governs and operates the University of California as a public trust through its 26-member board of Regents.  UC Irvine is one of the 20 campuses of the University of California system and is located in Irvine, California.

8.   Plaintiff is ignorant of the true names and capacities of respondents/defendants sued as DOES 1 through 50, inclusive, or is uncertain of their culpability and, therefore, sues these defendants by such fictitious names, and in their official capacities with the University of California.  Plaintiff will amend this petition to allege their true names and capacities when ascertained. Plaintiff is informed and believes

COMPLAINT FOR DAMAGES
2

and thereon alleges that each fictitiously named respondent or defendant is responsible in some manner for the occurrences herein alleged as the Plaintiff's injuries were proximately caused by such respondents/defendants.

9.   Non-Party JOHN ROE was at all times relevant an assistant professor at the University of California, Irvine, was responsible for a research laboratory where Jane Roe conducted research and John Roe was the supervisor of graduate student and non-party Jane Roe.

10. Non-Party JANE ROE was, at all times relevant, a graduate student at the University of California, Irvine, and worked in the laboratory of non-party John Roe and was supervised by John Roe.

11. Plaintiff uses the pseudonym of "John Doe" and "John Roe" and "Jane Roe" in the Complaint due to federal and state regulations governing student records and student discipline and to preserve privacy in a matter of sensitive and highly personal nature, which outweighs the public's interest in knowing the parties' identity. Use of the pseudonyms does not prejudice Respondents because the identity of Plaintiff is known to Respondents. (See, Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99); *Starbucks Corp. v. Superior Court* (2008) 68 Cal.App.4th 1436 ["The judicial use of 'Doe plaintiffs' to protect legitimate privacy rights has gained wide currency, particularly given the rapidity and ubiquity of disclosures over the World Wide Web"]; see also *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531; *Johnson v. Superior Court* (2008) 80 Cal.App.4th 1050; *Roe v. Wade* (1973) 410 U.S. 113; *Doe v. Bolton* (1973) 410 U.S. 179; *Poe v. Ullman* (1961) 367 U.S. 497; *In Does I thru XXIII v. Advanced Textile Corp.* (9th Cir. 2000) 214 F.3d 1058; see, Cal. Rules of Court, rule 2.550.)

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Defendants because it conducts business in Orange County California and because the transactions described in this Complaint took place in California.

13. The damages to be established at trial will exceed this court's threshold for unlimited jurisdiction matters ($25,000.00).

14. Venue is proper in the Orange County Superior Court because the University of California, Irvine is located in the County of Orange.  (Code Civ. Proc., § 395.)

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

## I.   REGULATORY BACKGROUND

15. Since 2016, significant litigation[1] has arisen to challenge the lack of Due Process and fairness in campus Title IX proceedings stemming from the U.S. Department of Education's Office for Civil Rights ("OCR")[2] threatening to withhold federal dollars in order to impose its guidance on how schools should investigate and adjudicate allegations of sexual misconduct,[3] in order to stem a purported tide of sexual violence on American college campuses.[4] OCR's efforts affect the rights of some 20.6 million undergraduate and graduate students in the United States, as well as the distribution of more than $100 billion in federal education funds each year.[5] Starting in 2011 OCR issued a series of "Dear Colleague Letters,"[6] now rescinded, responding in part to a special investigative report published by National Public Radio and the Center for Public Integrity,[7] which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. Much of the NPR report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses, and young men's cultural adherence to the sexual aggressor role. OCR relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline...when discussing our

---

[1] https://titleixforall.com/
[2] The Office for Civil Rights (OCR) is a sub-agency of the U.S. Department of Education and enforces several Federal civil rights laws, including Title IX.
[3] See, David G. Savage and Timothy M. Phelps, *How a Little-known Education Office Has Forced Far-reaching Changes to Campus Sex Assault Investigations*, (August 17, 2015) Los Angeles Times.
[4] See, *Rethink Harvard's Sexual Harassment Policy* (Oct. 15, 2014), The Boston Globe. ("As teachers responsible for educating our students about due process of law, the substantive law governing discrimination and violence, appropriate administrative decision-making, and the rule of law generally, we find the new sexual harassment policy inconsistent with many of the most basic principles we teach.") See also, Richard Dorment, *Occidental Justice*, (April 2015) Esquire; Teresa Watanabe, *More College Men Are Fighting Back Against Sexual Misconduct Cases*, (June 7, 2014) Los Angeles Times.
[5] Source: https://studentaid.ed.gov/sa/about/data-center/student/title-iv
[6] April 2011 "Dear Colleague Letter" https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ; and April 2014 "Questions and Answers on Title IX and Sexual Violence."
[7] Joseph Shapiro, *Campus Rape Victims: A Struggle For Justice*, (February 24, 2019), National Public Radio (http://www.npr.org/templates/story/story.php?storyId=124001493).

country's problem with rape and sexual assault."[8]  Relying on these faulty numbers, however, OCR minimized due process protections for the accused students by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting or eliminating cross-examination, and forbidding certain forms of alternative dispute resolution.

16. In 2014, Regents' president, Janet Napolitano, referred to accusers (94% of whom were female) as "victims" and "survivors," while referring to the accused (99% of whom were male) as "respondents."[9]

17. OCR's threatened withholding of funds put tremendous pressure upon universities, such as the University of California and UCI to (a) aggressively prosecute males accused of sexual misconduct; (b) severely discipline male students alleged to have engaged in sexual misconduct regardless of their innocence,[10] and (c) equate complainants in sexual misconduct proceedings as being female "survivors" who must receive preferential treatment and are presumed to be victims of sexual assault, requiring the accused student to overcome that presumption and prove their innocence.  The recognition of the effect of outside pressures on campus administrators is crucial in order to understand why the regulatory environment often plays a role in campus sexual misconduct and harassment proceedings where the accused student is invariably male.

18. One federal court has held that "[a]ccused students are entitled to have their cases decided on the merits . . . and not according to the application of unfair generalizations or stereotypes because of social or other pressures to reach a certain result."  (*Doe v. Brandeis Univ.* (D.Mass. 2016) 177 F.Supp.3d 561, 608.)  The result has been significant litigation in which the Superior Court of California and Courts of Appeal have repeatedly held, on numerous occasions, that Regents deprived the accused male student of

---

[8] Christopher Krebs and Christine Lindquist, *Setting the Record Straight on '1 in 5'*, (December 15, 2014) Time (http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/).

[9] Jane Napolitano, "Only Yes Means Yes: An Essay on University Policies Regarding Sexual Violence and Sexual Assault", Yale Law & Policy Review, Vol. 33 No. 2 (https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=1684&context=ylpr); Confronting Campus Sexual Assault, January 2015, https://www.edurisksolutions.org/Templates/template-article.aspx?id=2147484744&pageid=134.

[10] A 2015 study examined why a high "percentage of sexual assault allegations are false" and the rationale behind many of these false allegations as being "retribution for a real or perceived wrong, rejection or betrayal." Reggie D. Yager, *What's Missing From Sexual Assault Prevention and Response*, (April 22, 2015), pgs. 46–62 http: ssrn.com/abstract=2697788).

a fair proceeding in adjudicating Title IX misconduct allegations.  (See *Knight v. South Orange Community College Dist.* (2021) 60 Cal.App.5th 854, 866.)

### A.  FEDERAL TITLE IX

19. The Education Amendments of 1972 prohibit discrimination based on sex under any educational program activity receiving federal financial assistance. Specifically, the legislation known as Title IX of the Education Amendments of 1972 provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .  (20 U.S.C. § 1681(a).)

20. From Title IX's enactment in 1972 until 1997, the Department of Education (Department) never asserted jurisdiction over student-on-student sexual violence.  In March 1997, the Department issued regulations that required schools to have policies and procedures in place to deal with such conduct.   In January 2001, the Department issued additional guidance for schools to address sexual misconduct, provide Due Process, and alleviate any hostile environment on campus.  From 2011 to 2014, OCR issued Dear Colleague Letters and guidance, which have since been rescinded.

21. On August 14, 2020, the Department of Education amended the regulations implementing Title IX ("Regulations") to specify how recipients of Federal financial assistance covered by Title IX must respond to allegations of sexual harassment.  (34 C.F.R. § 106.44.)  The Regulations require every college and university that receives federal funds to adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging sexual harassment, which encompasses sexual assault, dating violence, domestic violence, and stalking.  "A recipient [of federal funding] with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."  (34 C.F.R § 106.44(a).)  The fundamental principle of such a system is that it be prompt and equitable.  (*Id*.)

22. Among other things, the Regulations require universities to (1) "provide for a live hearing" at which "the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses

all relevant questions and follow-up questions, including those challenging credibility";[11] (2) eliminate use of the "single investigator model," whereby the investigator is the sole individual who investigates and makes findings of responsibility;[12] and (3) provide the accused an opportunity to "inspect and review" all the evidence collected during the investigation, "including the evidence upon which the recipient does not intend to rely in reaching a determination."[13]

23. In supporting the Regulations, the American Civil Liberties Union (ACLU), commented that a fair process requires "the right to a live hearing and an opportunity for cross-examination in the university setting."[14]

**B. CALIFORNIA LAW REGARDING STUDENT DISCIPLINE**

24. In addition to Title IX and other relevant federal law, a state may have laws that govern campus sexual misconduct disciplinary proceedings, as California does.  California's procedural and substantive standards for student disciplinary proceedings begin with Code Civ. Proc., § 1094.5 subdivisions (b) and (c), which require that (1) there be "a fair trial," which "means that there must have been 'a fair administrative hearing'"[15]; (2) the proceeding be conducted "in the manner required by law"; (3) the decision be "supported by the findings"; and (4) the findings be "supported by the weight of the evidence," or where an administrative action does not affect vested fundamental rights, the findings must be "supported by substantial evidence in the light of the whole record."[16]

25. While California law does not require any specific form of disciplinary hearing, a university is bound by its own policies and procedures. (*Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271-72.)

26. The fair hearing requirements of Code Civ. Proc., § 1094.5(b) can only be satisfied in this context through adherence to principles of procedural due process, which apply directly to public

---

[11] 34 C.F.R. § 106.45(b)(6).
[12] 34 C.F.R. § 106.45(b)(7)(i).
[13] 34 C.F.R. § 106.45(b)(5)(vi).
[14] "ACLU Comment On Department Of Education's Final Title IX Rule On Sexual Harassment" (May 6, 2020) https://www.aclu.org/press-releases/aclu-comment-department-educations-final-title-ix-rule-sexual-harassment.
[15] *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (citations omitted).
[16] California has undertaken to protect vested fundamental rights "from untoward intrusions by the massive apparatus of government."  (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 142-143.)

COMPLAINT FOR DAMAGES

colleges and universities through the Fourteenth Amendment and to private colleges and universities by analogy.  (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221 (*USC1*).)

27. The Fourth Appellate District recently summarized the legal consensus that a student facing suspension or expulsion for nonconsensual sexual activity (like Doe) has the right to notice of the charges; the school must follow its own policies and procedures; the accused student must have access to all the evidence; there must be a live, in-person hearing, including testimony from the parties and witnesses; and because most cases turn on credibility (he-said, she-said), the adjudicator or adjudicators must be able to see the parties' testimony and the testimony of important witnesses so their demeanor may be observed, and the accused student must have an opportunity for cross-examination.  (*Knight v. South Orange Community College Dist.* (2021) 60 Cal.App.5th 854, 869 (*Knight*), citing *Goss v. Lopez* (1975) 419 U.S. 565, 583-84 (*Goss*); *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1232, fn. 25;  *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44, 56;  *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1104; *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 637; *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 224; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1271-72; see also *Doe v. Baum* (6th Cir. 2018) 903 F.3d 575; *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393.)

## C.  SUMMARY OF REGENTS' TITLE IX INVESTIGATION AND ADJUDICATION POLICIES

28. Since at least 1970, the Policies Applying to Campus Activities, Organizations and Students ("PACAOS") Section 100.00 comprised University of California Regent's policy for student conduct and discipline.[17] Among other Due Process protections provided to students accused of misconduct, students are afforded, "The opportunity for a prompt and fair hearing where the University shall bear the burden of proof, and at which the student shall have the opportunity to present documents and witnesses and to confront and cross-examine witnesses presented by the University; no inference shall be drawn from the silence of the accused;. . ."

---

[17] https://www.ucop.edu/student-equity-affairs/policies/pacaos.html

29. In response to the now-rescinded federal Title IX[18] guidance issued in 2011 and 2014,[19] Regents instituted an entirely separate administrative judicial system for cases involving sexual misconduct and sexual harassment.  OCR has acknowledged that using a different procedure for sexual harassment issues as opposed to other disciplinary issues, as was done here, "suggests a discriminatory purpose and should be avoided."  (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).  Regents new separate process for adjudicating reports of sexual misconduct were set forth in: (1) the Policy for Sexual Violence and Sexual Harassment ("SVSH Policy"); and (2) Appendix-E: Sexual Violence and Sexual Harassment Student Adjudication Framework ("Appendix E"), which were issued and effective January 1, 2016.

30. After January 2016, Title IX sexual misconduct cases did not include the Due Process protections afforded to students accused of non-sexual misconduct under PACAOS-100.  The central feature of Regents' new adjudication process for quasi-criminal allegations of sexual assault and nonconsensual sexual activity was the reliance upon a sole investigator,[20] who served in divided and inconsistent roles, acting as investigator, prosecutor, and adjudicator interviewing the parties and witnesses and making all factual findings, credibility determinations, and conclusions of responsibility. (Appendix E, p. 6-7.)

31. All findings and determinations were made without a live evidentiary hearing, without an opportunity for cross-examination, and in the absence of a neutral reviewing panel. (Appendix E, p. 7.) The students were not provided all the evidence gathered in the investigation and were only provided

---

[18] The University is a recipient of federal funds and is bound by Title IX and its regulations. Regents represents that its grievance procedures and SVSH Policy (2016) concerning sexual harassment and related offenses comply with its legal obligations under Title IX of the Education Amendments of 1972, the Violence Against Women Reauthorization Act of 2013, and Ed. Code, § 67386.

[19] April 2011 "Dear Colleague Letter" https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf ; and April 2014 "Questions and Answers on Title IX and Sexual Violence." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

[20] Such arrangements were discouraged by OCR.  By allowing one person to act in all of these roles, that individual's biases and mistakes may persist in an investigation and adjudication unrestrained. Colleges and university are to ensure that individuals who play a role in receiving, investigating, and processing student complaints of sex-based harassment do not have any actual or perceived conflicts of interest in the process.  (See, *University of Montana*, DOJ Case No. DJ 169-44-9, OCR Case No. 10126001, May 9, 2013.)

with evidence the investigator deemed relevant in making their findings.  The changes led to an apparent atmosphere of anti-male bias within college and university Title IX office and little or no gender diversity in personnel involved in the Title IX administrative process.

32. In January 2019, the California Court of Appeal found the single investigator process to be fundamentally flawed and lacking in Due Process so colleges and universities, including Regents, scrambled to correct their policies.  (See UCOP SVSH Resources[21]; *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061.)  On March 1, 2019, PACAOS Appendix-E was replaced by "Interim Revisions" designed to bring the 2016 PACAOS policy into compliance with California and Federal law.[22]

33. The University of California's sexual misconduct policies have been rescinded and replaced at least two more times since March 2019 due to Respondent's abject unwillingness to provide accused students with due process.  The federal Title IX regulations now prohibit reliance on a sole investigator for adjudication of sexual misconduct allegations.  (34 C.F.R. § 106.45 (b)(7).)  Due Process required an accused student to receive a formal evidentiary hearing before an impartial decider(s)[23] where the student is presumed innocent, or not responsible, and at the hearing the University bears the burden to prove each part or element of each charged policy violation by the preponderance of evidence, and the student has the right to cross-examine witnesses, submit evidence, and an opportunity to present a full defense.[24]

1.   ***Regents' Non-Professional Investigators***

34. Regents does not rely upon sworn law enforcement officers or licensed private investigators to investigate allegations of student-on-student misconduct and harassment. However, California's

---

[21] Source: https://www.ucop.edu/title-ix/resources/index.html
[22] Source: https://www.ucop.edu/title-ix/resources/index.html
[23] An impartial decider is a core protection under Due Process and fair procedure.  (*Natarajan v. Dignity Health* (2019) 42 Cal.App.5th 383, 389.)  "Moreover, [f]airness requires a practical method of testing impartiality. (*Hackethal v. California Medical Assn., supra,* 138 Cal.App.3d 435, 444.)" (*Rosenblit v. Superior Court* (l991) 231 Cal.App.3d 1434, 1448.)  UC Berkeley provides no information regarding the training and qualifications of its investigators, nor of their neutrality and impartiality. )
[24] SVSH policy as revised 7/31/2019, 8/14/2020; PACAOS-Appendix-E, revised 7/31/2019, 8/14/2020; *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055; *Doe v. Regents of University of California* (2018) 28 Cal.App.5th 44; *Doe v. Allee* (2019) 30 Cal.App.5th 1036; *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1230-1231; *Marcus Knight v. South Orange Community College Dist. (2021) 60 Cal.App.5th 854*.

statutory scheme for regulating the conduct and qualifications of investigators requires licensing for "[A] person…who, for any consideration whatsoever. . . engages in business or accepts employment to furnish, or agrees to make, or makes, any investigation for the purpose of obtaining, information with reference to:

> (a) Crime or wrongs done or threatened against the United States of America or any state or territory of the United States of America.
>
> (b) The identity, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputation, or character of any person.
>
> …(e) Securing evidence to be used before any court, board, officer, or investigating committee.

35. "No person shall engage in the business of a private investigator… unless that person has applied for and received a license to engage in that business pursuant to this chapter."  Bus. & Prof. Code § 7523(a).

36. In its new SVSH policy, Regents placed the entire responsibility for the investigation, prosecution, fact-finding, and adjudication in the hands of non-sworn, non-licensed individuals who acted as police, prosecutor, and judge without a hearing.

37. This dual or triple role of a single person investigating complaints and presenting or prosecuting the case on behalf of the University and also adjudicating responsibility or guilt, creates a potential conflict that can deprive complainants and respondents of an adequate, reliable, and impartial investigation. Such arrangements have been discouraged by the U.S. Department of Education, Office for Civil Rights and the U.S. Department of Justice Civil Rights Division.  Colleges and university are to ensure that individuals who play a role in receiving, investigating, and processing student complaints of sex-based harassment do not have any actual or perceived conflicts of interest in the process.  (See, *University of Montana*, DOJ Case No. DJ 169-44-9, OCR Case No. 10126001, May 9, 2013.)

## II.  REGENTS' ADMINISTRATIVE PROCEEDINGS AGAINST PLAINTIFF

### A.  THE INITIAL FALSE REPORT BY JOHN ROE AND JANE ROE

38. In February 2016, Assist. Prof. John Roe reported to University of California, Irvine ("UCI")

police department and to the UCI Title IX Office[25] that Plaintiff had a romantic interest in a graduate student in his lab and under his supervision, Jane Roe, that Plaintiff had been stalking Jane Roe for the previous four years, including hacking her computer and social media accounts, and more recently had sabotaged her lab work.[26]

39. The allegations, made by John Roe and Jane Roe against Plaintiff, were false and malicious and made without probable cause.  Plaintiff's interactions with Jane Roe were innocuous and over several years consisted of typical of extensions of social niceties, friendship, and kindness among colleagues.

40. Shortly after making his report against Plaintiff, John Roe submitted an insurance claim to UCI to recover $25,376.74 for his lab's funding for the alleged sabotage to the lab work, equipment, and supplies, based on Jane Roe's and John Roe's false allegations against Plaintiff.

41. In March 2016, the UCI Title IX Office initiated a formal Title IX disciplinary action against Plaintiff based on the allegations made by John Roe and Jane Roe.

42. On March 22, 2016, Plaintiff received a letter from Crystal Rae Lugo-Shearer, Director of Student Conduct, stating that:

> . . .we have received allegations that you may have violated the following University policy specified in the University of California Policies Applying to Campus Activities, Organizations, and Students and UC Sexual Harassment and Sexual Violence Policy, as implemented in the UCI Guidelines for Reporting and Responding to Reports of Sex Offenses.

43. Ms. Crystal Rae Lugo-Shearer listed in her letter eight (8) Student Conduct Policies section and the preamble to the Student Conduct Policies/University of California Sexual Violence and Sexual Harassment Policy, but did not provide any notice regarding the allege misconduct other than stating:

---

[25]  The UCI Title IX Office refers to the office(s), department(s), and personnel responsible for compliance with Title IX. According to its website, the UCI Office of Equal Opportunity and Diversity ("OEOD") is responsible for the University's compliance with federal, including Title IX, and state laws and University policies and procedures regarding discrimination, retaliation, sexual harassment, and sex offenses.  Within OEOD, Sexual Harassment/Title IX Officer (SHO) is responsible for coordinating the University's compliance with federal and state discrimination and sexual harassment laws, as well as investigations of sex offenses. The Title IX Officer has general responsibility for oversight of the reporting process and investigation of a report, other offices at each location will be involved and consulted as necessary.  http://sexualviolence.uci.edu/

[26] There are no allegations of any intimate relationship nor of any physical touching between Plaintiff and Jane Roe.

"Summary of Allegations: Allegations of research misconduct and stalking."

44. Ms. Crystal Rae Lugo-Shearer also ordered Plaintiff to stay 100 yards from Jane Roe and restricted Plaintiff's access to his ongoing graduate research and UCI buildings Natural Sciences II, Engineering Hall, and Gross Hall.

45. UCI Title IX Office did not conduct any inquiry before initiating their March 2016 investigation into research misconduct as is required by UCI research misconduct policy and the Public Health Service Policies on Research Misconduct, 42 C.F.R. Part 93.

46. The UCI Title IX investigation was supervised by a "case management team".  This team included Jill Yanago Kay, the Director of Research Policy at UCI.  According to UCI policy, the case management team oversees the Title IX investigation and adjudicatory process at all stages of the case and Director Jill Kay frequently communicated with the UCI Title IX Office and the Title IX investigator during the noncompliant investigation.  The UCI Office of Research website reflects that Jill Yanago Kay normally handles investigation of research misconduct through UCI's Office of Research and is very familiar with requirements of UCI's policy on research misconduct.

47. In her oversight role of the UCI Title IX Investigation of Plaintiff, UCI Director of Research Policy Jill Yanago Kay did nothing to correct the noncompliant Title IX investigation into research misconduct.

48. UCI Title IX did not provide Plaintiff adequate notice of the allegations of research misconduct nor did UCI Title IX provide adequate information on the factual basis of the stalking allegations, nor other policy violations.

49. Ms. Crystal Rae Lugo-Shearer's letter also notified Plaintiff that UCI had assigned Tierney Anderson, from the Office of Equal Opportunity and Diversity, to investigate the allegations.

50. The UCI Title IX Office did not provide any information regarding efforts taken by the UCI to test Title IX investigator Tierney Anderson's impartiality as an adjudicator and as an investigator.

51. The UCI Title IX Office did not provide information as to Tierney Anderson's qualifications, education, experience, and professional licenses as an investigator and adjudicator.

52. Title IX investigator Tierney Anderson did not have any background in science and did not have even a basic understanding of cell biology and biological research, rather Ms. Anderson's background

1  was in mediation, psychology, and international relations.

2     53. Plaintiff cooperated in the Title IX investigation, meeting with Title IX investigator Anderson

3  several times and providing documents to support his defense that the allegations against him were

4  entirely false.

5     54. Plaintiff requested access to the evidence collected in the investigation but was refused by the

6  UCI Title IX Office and by Title IX investigator Tierney Anderson.

7     55. Plaintiff requested access to the investigation file, but was refused access in violation of UCI's

8  policy that provides:

9
            The investigation file must be retained and made available to the parties on
10          request, and may be redacted as necessary to protect student privacy rights.

11    56. The Title IX investigation disclosed no direct evidence of stalking.

12    57. The Title IX investigation disclosed no direct evidence of any computer hacking.

13    58. The Title IX investigation disclosed no direct evidence that Jane Roe's online accounts were ever

14  compromised or hacked by anyone, let alone by Plaintiff.

15    59. The Title IX investigation produced no direct evidence that any of Jane Roe's lab work for John

16  Roe was sabotaged or intentionally damaged, as opposed to being inadvertently contaminated through

17  poor research techniques by Jane Roe and John Roe's lab.

18    60. Title IX investigator Tierney Anderson's investigation report listed 113 exhibits that were not

19  provided to Plaintiff.

20    61. Title IX investigator Tierney Anderson's report listed 40 unidentified witness that had been

21  interviewed or provided information in the Title IX action, however, the UCI Title IX Office and the

22  Title IX investigator refused to identify the witnesses to Plaintiff.

23    62. On June 26, 2016, Title IX Investigator Tierney Anderson issued an investigation report finding

24  by a "preponderance of the evidence," "that [Doe] contaminated, tampered with, and sabotaged [Roe's]

25  work in both NSII and in EH."  Ms. Anderson further found that "a preponderance of the evidence

26  supports a finding that [Doe] violated the University of California Policy [regarding stalking]."  This

27  report listed 113 exhibits, none of which were provided to Doe. Furthermore, the investigation report

28  stated that Title IX  Investigator Anderson had interviewed 40 witnesses, but these witnesses were not

_____

identified to Doe. Title IX investigator Tierney Anderson made factual findings based on evidence that was withheld and concealed by UCI Title IX and the investigator, in violation of Plaintiff's civil rights.

63. On June 28, 2016, Plaintiff requested copies of the 113 exhibits cited in investigator Tierney Anderson's investigation report, the witness statements and the identity of the witnesses identified only as Witnesses 2 through 40 in the report, and other evidence gathered during the investigation.  In his request to Crystal Rae Lugo-Shearer, UCI Director Student Conduct, Plaintiff wrote:

> [Plaintiff] cannot possibly respond to the Title IX/OEOD investigator(s)' opinions in the summary report without the evidence summarized in the report, and certainly not within the five days you have demanded in your letter. Your failure to provide the student with any of the evidence and requiring the student "to request access to the evidence against him does not comply with the requirements of a fair hearing." See, *Doe v. University of Southern California* (Cal. App. 2d Dist. 2016) 246 Cal. App. 4th 221. Common sense dictates that the use of secret, unidentified witnesses in a state university disciplinary matter does not comport with Due Process.

64. That same day Plaintiff also submitted a request for the records to UCI's Public Records Office under the California Public Records Act ("CPRA"), Gov. Code §§ 6250-6270.

65. Also on June 28, 2016, Plaintiff submitted a CPRA request to UCI Police Department for police reports related to Plaintiff, included a purported investigation into Jane Roe's complaint of unauthorized computer access in early 2014.

66. Plaintiff continued to make requests for access to the UCI Title IX investigation file.

67. For the next six months, however, UCI Title IX Office and UCI Public Records refused to produce any documents.

68. Kirsten K. Quanbeck, UCI Associate Chancellor, was the supervisor of UCI Public Records, was also the Director of the UCI Title IX Office --Office of Equal Opportunity and Diversity, -- and was the University's Title IX/Sexual Harassment Officer.  Ms. Quanbeck is also the University's designated Whistleblower officer in charge of receiving and reviewing complaints of suspected unlawful and improper acts at UCI.

69. Since Kirsten K. Quanbeck is responsible for both UCI Title IX Office, which conducted the investigation against Plaintiff and refused to disclose the 113 exhibits and 40 unidentified witnesses, and is responsible for UCI's Public Records Office, which withheld records for almost six months, Ms.

Quanbeck was in a position to frustrate Plaintiff's lawful access to the UCI Title IX investigation file and to deny his lawful access to the records sought through his Public Records Act requests.

70. UCI's refusal to comply with UCI policy and Gov. Code §§ 6250-6270, were part of a pattern of concerted efforts by certain UCI administrative personnel to deprive Plaintiff of his civil rights under the color of authority.

71. On August 25, 2016, the Director of Student Conduct Crystal Rae Lugo-Shearer adopted Title IX Investigator Anderson's opinion that Doe violated the UCI policies against stalking, physical abuse, and sexual violence/sexual harassment, and sanctioning him to a suspension of two years. While the letter specified that Plaintiff had violated the broadly worded sections 102.10 and 102.08 of the Student Conduct Policies, the decision letter did not specify any specific section of the SVSH policy that had been violated.

**B.  TITLE IX ADMINISTRATIVE APPEAL HEARING**

72. On September 8, 2016, Plaintiff filed a timely appeal of the Director of Student Conduct's opinion.  Plaintiff cited the following grounds in his appeal: (1) procedural error in the University's process had materially affected the outcome; (2) the decision by Director Crystal Rae Lugo-Shearer was unreasonable, as it was not supported by substantial evidence; (3) new evidence, material to the decision, was not known or available during the time of the decision had come to light; and (4) the disciplinary sanctions were disproportionate to the findings.

73. On November 10, 2016, Plaintiff's appeal case No. 00467-001-2016 proceeded to an appeal hearing before Mr. Greg Rothberg, Associate Director Campus Recreation, and Ms. Neha Rawal, Senior Associate Director of Student Affairs for Donald Bren School of ICS, and Tamara Austin,[27] Senior Student Affairs Gender Education as the Appeal Body.

74. The Appeal Body was assisted by attorney Peter Schneider, UCI Office of Campus Counsel.

75. The following witnesses appeared before the Appeal Body:

- UCI Assist. Prof. John Roe;
- UCI Student Conduct Director Crystal Rae Lugo-Shearer;

---

[27] Ms. Austin was present for the initial session of the Appeal Body hearing, but was excused for personal reasons and did not take part in the Appeal Body's deliberations or decision.

- UCI Title IX Investigator Tierney Anderson;
- Jane Roe; and
- Plaintiff.

76. Although Plaintiff was not permitted to cross-examine any witnesses, Plaintiff was allowed to submit proposed witness questions to the Appeal Body.

77. The Appeal Body asked only a few of the questions that Plaintiff had submitted.

78. The Appeal Body was presented with documents, exhibits, and other records submitted both before and during the hearing.

79. Neither Plaintiff nor the Appeal Body had access to the UCI Title IX investigation file, the 113 exhibits and unidentified witnesses listed in Title IX investigator Tierney Anderson's investigation report.

80. The violations of Doe's due process rights were so obvious that even the University's own Appeal Body questioned them, including asking why Doe was not given a copy of the exhibits and why Title IX Investigator Tierney Anderson never determined who was using the IP addresses on the computer hacking claims. ["If so much depends on the computer hacking claims, why didn't you find out from OIT who was using the IP addresses?"].)

81. UCI Title IX investigator Tierney Anderson provided evasive responses to the Appeal Body regarding the investigation file.  (RT 154:2-3; 154-156.)

| MS. RAWAL: | Why hasn't [Plaintiff] been given access to the investigation file? |
| MS. ANDERSON: | It is my understanding that the parties were given what the student adjudication model refers to as the investigative file, which is the Title IX report and the notification letter by the director of student conduct. That's the way the policy dictates it. The policy does not require that the investigator share working papers with either party. And so I follow this practice and the policies. |
| MS. RAWAL: | Does the investigation file include the 113 exhibits that you list in your report? |
| MS. ANDERSON: | : Student adjudication refers to the investigative file means the report of findings, the Title IX report, and the notification letter. It is an 88 page report. |

…

MS. RAWAL:          So where are the 113 exhibits?

MS. ANDERSON:       Can you repeat the question?

MS. RAWAL:          Where are the 113 exhibits?

MS. ANDERSON:       They are part of the investigator's working papers. All of the
                    information that I relied upon to make this decision is in this
                    report. All of  the content of the material that I relied upon to
                    make the recommendation was shared with the respondent in that
                    we discussed the material during interviews with both his lawyers
                    present. The material came from him or it was summarized in the
                    report.

82. Although Title IX investigator Tierney Anderson knew that the UCI Police and UCI Office of

Information Technology ("OIT") found no evidence of hacking, cyberstalking, or unauthorized

computer access back in the spring of 2014, and that Jane Roe's allegations were false, Tierney

Anderson did not disclose what she knew, but chose to mislead the Appeal Body (RT 154:13 -155:13.):

MS. RAWAL:          What is the status of the police investigation from 2014?

MS. ANDERSON:       You would have to ask them.

MS. RAWAL:          Can OIT determine who is logged onto a UCI computer at any
                    given time?

MS. ANDERSON:       I'm not the right person to ask.

MS. RAWAL:          What did OIT tell you about their investigation in 2014?

MS. ANDERSON:       Everything that I know about the investigation is in this report.
                    Please refer to it.

MS. RAWAL:          You spoke to OIT on June 22nd, 2016, but there is no mention of
                    what you learned in your report. Why?

MS. ANDERSON:       All of the material that I relied upon to make a recommendation
                    of a policy violation is in the report.

MS. RAWAL:          If so much depends on the computer hacking claims, why didn't
                    you find out from OIT who was using the IP addresses?

MS. ANDERSON        I conducted my investigation in compliance with our system-
                    wide policies. I interviewed the parties and witnesses and
                    reviewed evidence and made a recommendation utilizing the
                    preponderance of the evidence standard and applying the policies
                    neutrally.

---

COMPLAINT FOR DAMAGES

83. UCI Director of Student Conduct Crystal Rae Lugo-Shearer was also at a loss to tell the Appeal Body why Plaintiff had not been provided the 113 exhibits, nor any of the unidentified witness statements, nor the status of the police investigation from 2014 and the OIT investigation from 2014. (RT 144-145.)

| MS. RAWAL: | Why hasn't [Plaintiff] been given the 113 exhibits and any of the 40 witness statements? Or to collapse it, why hasn't he been given access to the investigation file? |
| MS. LUGO-SHEARER: | I cannot answer that question.  The information that I receive is the Title IX report, which I gave [Plaintiff] full access to. |
| MS. RAWAL: | What is the status of the police investigation from 2014? |
| MS. LUGO-SHEARER: | I do not know. |
| MS. RAWAL: | Can OIT determine who is logged onto a UCI computer at any given time, to your knowledge? |
| MS. LUGO-SHEARER: | I do not know. |
| MS. RAWAL: | What did OIT tell you about their investigation in 2014? |
| MS. LUGO-SHEARER: | I did not speak to OIT. |

84. On November 18, 2016, the Appeal Body issued their "Decision of Appeal Body, Appeal from a decision of the Student Conduct Office dated August 25, 2016" and reversed two of the three findings of responsibility against Plaintiff.  In reversing responsibility for stalking, the Decision states that "The [Appeal] Body was not provided with <u>any evidence</u> of Respondent making a credible threat against Complainant."  (emphasis in original.)  Regarding allegations of computer hacking, the Appeal Body noted:

> "[I]t is clear from the investigation report that the investigator's conclusion about a violation of the Sexual Violence Policy turns on the question of whether Respondent hacked into various social media and other cyber-accounts of Complainant. According to the report, this had been reported to authorities as far back as 2014. Yet, the [Appeal] Body hasn't been provided with any direct evidence linking Respondent to a hack. Given the length of time that has elapsed since the incidents were reported, the Body doesn't understand why there isn't any direct evidence of this. When this lack of direct evidence is coupled with the uncertainty and potential prejudice created by Respondent not receiving access to the entire investigation file,

> the Body does not believe sufficient evidence exists to find, by a preponderance of the evidence, that there was a violation of the Sexual Violence Policy. Therefore, the Body overturns that finding by the Student Conduct Office." (Appeal Body Decision, page 7.)

85. Regarding section 102.08 Physical Abuse, although the Appeal Body was presented with no evidence of any physical contact whatsoever, let alone abuse, and no evidence of computer hacking, and no direct evidence of stalking, the Appeal Body denied Plaintiff's appeal based on "the sheer volume of the contacts [with Jane Roe] temporally related to seemingly private electronic communications has made [Jane Roe] fearful and concerned" and that, "[t]hese coincidences didn't stop until the Stay Away Order went into effect. The correlation between the effect of the Stay Away Order and cessation of incidents can't be ignored."[28]

86. Based on evidence that Jane Roe was allegedly "fearful and concerned" in early 2014, the Appeal Body did not reverse the opinion that Plaintiff was responsible for Physical Abuse, stating:

> The Appeal Body believes the catch-all phrase "or other conduct that threatens the health or safety of any person ... " is broad enough to apply to this matter.

87. On November 29, 2016, Doe filed a timely appeal to Vice Chancellor Thomas Parham. The appeal was required to be limited to procedural error that materially affected the outcome or that the sanction was disproportionate to the findings.

88. On December 1, 2016, Plaintiff was notified by the UCI Public Records Office that his requests for records would be consolidated as reference number PRA# 3046 and processed.

89. On December 7, 2016, the Office of the Vice Chancellor Thomas Parham confirmed receipt of the Appeal and provided a copy to Jane Roe.

90. On December 13, 2016, Jane Roe submitted a statement along with other documents in response to Doe's appeal. Doe was not provided with a copy and was not permitted to respond.

91. On December 14, 2016, the Office of the Vice Chancellor notified Plaintiff of Vice Chancellor Thomas Parham's unilateral decision to extend the deadline for his written response to Plaintiff's appeal

---

[28] Jane Roe had alleged only three incidents, the most recent in February 2014, more than two years before the UCI Title IX Stay Away Order and Jane Roe had testified that only the alleged research misconduct, after July 2015, caused to her to fear for her safety.

1    "due to the need to carefully review all of the voluminous materials associated with the case..."

2    92. On December 15, 2016, Plaintiff submitted his "Objection to Improper Delay of Appeal

3    Decision" objection to the University's repeated failure to keep deadlines and stating:

4           My appeal is only three (3) pages long and there is only one issue to be
5           reviewed, -- the Appeal Body's use of a vague "catch-all phrase" to find a
            violation of 102.08 [Physical Abuse] when the Appeal Body was not
6           provided with any evidence of Respondent making a credible threat against
            Complainant. (Appeal Decision, at page 6, underline in original.) It is
7           entirely improper for the Vice Chancellor to carefully review all of the
8           voluminous materials associated with the case. That is what the Appeal
            Body has already done, and found in my favor on two of the three issues.
9           The appeal is not a rehearing or reexamination of the case materials, but is
10          made on the limited grounds allowed by the UCI policy.

11   93. On December 19, 2016, Edgar Dormitorio, Assistant Vice Chancellor & Chief of Staff

12   Communications & Special Programs, responded to Plaintiff's objection with the following explanation:

13          [I]t is important for us to emphasize that one of the guiding principles for
14          this process is that it is a fair process for all parties involved. As such, we
            believe a delay is necessary in order to make the appropriate decision on the
15          outcome of this case.

16   94. On December 22, 2016, UCI Public Records Office produced 1,869 pages of documents,

17   however, many pages heavily were redacted and the response was incomplete but was somewhat

18   responsive to his public records request made six months earlier.

19   95. The next day, on December 23, 2016, Edgar Dormitorio, Assistant Vice Chancellor & Chief of

20   Staff Communications & Special Programs advised Doe, that they "learned that documents relating to

21   the OEOD investigation have been made available to you pursuant to a public records act request." He

22   continued, "we invite you to let us know how those documents you did not have would have materially

23   affected the outcome of your matter." According to Vice Chancellor Thomas Parham, Doe was now

24   responsible for establishing how any of the 1,869 heavily redacted pages might have changed the

25   outcome of the Appeal Body hearing.

26   96. On January 4, 2017, Doe timely responded, explaining "[t]he documents turned over on

27   December 22, 2016, even in their heavily redacted form, show that there is no evidence of stalking, no

28   evidence of hacking, and no evidence of intentional contamination by anyone." Further, "[t]he records

---

COMPLAINT FOR DAMAGES

21

that have been provided show that the stalking and computer hacking allegations were manufactured by [John Roe] and [Jane Roe] after the fact," and [John Roe] used [these allegations] to justify his insurance claim for some $25,000." Doe was further able to pinpoint specific lies told by Jane Roe to the Appeal Body, including that she told the Appeal Body she did not know the outcome of a 2014 cyberstalking complaint she had made, but the evidence revealed that she did know and she told Investigator Anderson that the police had found no evidence to support her claims. ([police "Investigation showed nothing"]; [no "hard evidence"].) This evidence also revealed that Title IX Investigator Tierney Anderson was untruthful to the Appeal Body when she said "You would have to ask them," in response to a question regarding "the status of the police investigation from 2014." Likewise, Jane Roe told the Appeal Body that she had not received a report from OIT but the documents revealed that she submitted several OIT reports to Investigator Tierney Anderson, which revealed no misuse of login credentials.  These documents proved not only that Jane Roe was untruthful to the Appeal Body but also that Title IX Investigator Tierney Anderson knew that her finding of hacking was fully contradicted by the evidence. An email dated May 19, 2016, reveals that Title IX Investigator Anderson was told that "there does not appear to be any misuse of login ID/credentials." (May 19, 2016 email.)  In a similar vein, John Roe falsely told the Appeal Body that IP addresses related to Jane Roe's hacking "came from inside the lab," despite his knowledge that OIT found no evidence of hacking whatsoever.  Further evidencing the malicious conspiracy between Jane Roe and John Roe, John Roe's statement that contamination in Jane Roe's research only occurred in places where Doe had access was proven completely false by the documents, which showed that contamination occurred in the locked cell culture room and the contamination continued to occur after Doe was restrained from entering the building.  Jane Roe's emails proved that her own negligence cause the contamination of certain lab cultures. Jane Roe had written, "I am very certain that I contaminated them."  Jane Roe falsely told the Appeal Body that there was no contamination after Doe was banned from entering the building, but the documents reveal that there was contamination after March 22, 2016.

97. Under UCI's policy, the Vice Chancellor is to consider only procedural errors and sanctions, not substantive issues such as whether findings are supported by the weight of substantial evidence.

98. In his appeal decision letter dated January 10, 2017, Vice Chancellor Thomas Parham references

the "voluminous materials"[29] he reviewed (but not the 1,869 pages of evidence turned over December 22, 2016) and spends some four pages improperly analyzing whether there was sufficient evidence to support a finding of stalking and physical abuse.

99. In his analysis of the evidence, Thomas Parham considered as significant and credible Title IX investigator Tierney Anderson's summary on page 23 of her investigation report and her listing of "over 45 examples" of alleged behavior by Plaintiff.

100.    The entire stalking case against Plaintiff rests on the credibility of Jane Roe's statements regarding the "over 45 examples."  There is no other evidence that corroborates Jane Roe's list of "over 45 examples," which list Jane Roe did not create until John Roe submitted the insurance claim to recover $25,376.74 for the alleged sabotage to Jane Roe's lab work, equipment, and supplies.

101.    Wherever Jane Roe's allegations can be tested, such as her claims of cyberstalking, computer hacking, unauthorized account access, her allegations are shown to be false.

102.    After finding that the investigation report summary and "over 45 examples" were credible, Vice Chancellor Thomas Parham rejected Plaintiff's January 4, 2017 showing that the 1,869 pages, turned over after the Appeal Body hearing and after Plaintiff submitted his appeal, tended to show that both investigator Tierney Anderson and Jane Roe made false statements to the Appeal Body.

103.    Vice Chancellor Parham wrote:

> Respondent's January 4, 2017 response, in essence, would have me improperly speculate about the credibility of Complainant, Reporting Party and the investigator in order to conclude that the Appeal Panel might have ruled differently. However, my role is not to make credibility determinations or to speculate. Respondent simply has not met the required showing for his procedural appeal.

104.    Vice Chancellor Thomas Parham is correct that his role in the appeal is not to make credibility determinations, though he did just that in adopting the page 23 report summary and "over 45 examples" as credible evidence.  The Appeal Body had considered that same evidence, listened to the witnesses, and reversed two of the remaining three charges against Plaintiff.

105.    Vice Chancellor Thomas Parham was required to determine whether the evidence that UCI

---

[29] Plaintiff did not receive the UCI CPRA production until almost a month after he had submitted his final appeal to Vice Chancellor Thomas

COMPLAINT FOR DAMAGES

23

Title IX and UCI improperly withheld from Plaintiff,-- evidence that tended to show that investigator Tierney Anderson and Jane Roe made false statements in submissions to the Appeal Body and on November 10, 2016, -- would have made a difference to the Appeal Body in making their decision.

106.    In refusing to make that determination, Vice Chancellor Thomas Parham failed to proceed in the manner required by UCI policy.

107.    Vice Chancellor Thomas Parham did state in his appeal denial letter, "I am troubled by the fact that UCI Title IX did not disclose its 'investigation file' to [Plaintiff] after the completion of its investigation...The OEOD Investigator should have made as much of her investigation file (as opposed to merely her report) available."

108.    Vice Chancellor Thomas Parham, after saying that he could not speculate and, therefore, rejected Plaintiff's January 4, 2017 submission, then speculated that the University's refusal to provide Plaintiff with the investigation file was "not a procedural error that would have changed the outcome," as Plaintiff had a "substantial and sufficient amount of the file in advance of the Appeal Body hearing."

109.    Vice Chancellor Thomas Parham did not identify what portion or amount of the 1,869 pages he believed that Plaintiff had before the hearing, nor why Thomas Parham believed that the amount was "sufficient" for Plaintiff and the Appeal Body.

110.    On January 10, 2017, Vice Chancellor Thomas Parham issued his appeal decision letter. Although he was not supposed to make findings of credibility, Vice Chancellor Parham found Title IX Investigator Anderson to be credible despite the overwhelming evidence to the contrary. Vice Chancellor Parham rejected Doe's January 4, 2017 letter, finding that UCI's failure to provide the evidence "was not a procedural error that would have changed the outcome."

111.    Vice Chancellor Thomas Parham concluded:

> Based on all of the above, I find that the procedural errors identified by Respondent did not materially affect the outcome of this matter. …
>
> This decision is final and there is no further right to appeal.

112.    Vice Chancellor Parham's decision was the final administrative decision at UCI on Regents' first Title IX investigation against Plaintiff.

---

### C.  PLAINTIFF SUCCESSFULLY SOUGHT JUDICIAL REVIEW OF THE IMPROPER TITLE IX DECISION

113.    On March 10, 2017, John Doe filed a verified Petition for Writ of Mandamus seeking to have the University of California, Irvine set aside its findings and sanctions against him after an investigation that lacked due process and evidence to support the findings, was replete with procedural errors, and was a prejudicial abuse of discretion.  Administrative mandamus relief fundamentally lies in equity.  (*City of Mountain View v. Superior Court* (1975) 54 Cal.App.3d 72, 81-82.)

114.    After a five-month investigation into the entirely false allegations that Doe had stalked Jane Roe and then sabotaged her lab, which investigation began in February 2016 and ended June 2016, the University issued an Investigation Report that referenced significant evidence that was never provided to Doe. (Writ Petition, ¶¶ 72, 97, 102.) Doe requested the evidence. (Writ Petition, ¶¶ 103 – 104.) Six months later, the University produced only heavily redacted copies of the evidence. (Writ Petition, ¶ 112.) During the administrative appeal, the Appeal Body recognized the procedural errors and questioned the failure to investigate relevant facts, such as making a determination as to who was using the IP addresses in question. (Writ Petition, ¶¶ 123 – 125.) Nevertheless, Doe was ultimately determined to be responsible for violation of the Section 102.08, Physical Abuse, of the Sexual Violence Policy, despite there being no physical contact between Doe and Jane Roe. (Writ Petition, ¶¶ 127, 157.)

115.    On April 13, 2017, the University submitted its Answer to Petition for Writ of Mandamus. ("Writ Answer".) This Writ Answer included 14 Affirmative Defenses, including laches and unclean hands. (Writ Answer, ¶¶ 172 – 185.)  The Respondents were represented by the University of California Office of the General Counsel and the law firm Munger, Tolles & Olson LLP. ("Writ Answer".)

116.    Doe issued discovery to the University seeking the evidence the University intended to rely upon to support its Affirmative Defenses.

117.    On May 15, 2015, the University filed a Motion to Quash Petitioner's Requests for Discovery.

118.    On July 10, 2017, the University filed the Respondent The Regents of the University of California's Offer of Judgment Pursuant to Code Civ. Proc., § 998.  In this Offer of Judgment, the University offered to set aside its findings and sanctions without admitting any wrongdoing and retaining the right to re-initiate administrative action against Doe without limitation, which would have

expanded the rights of the University under its own policy.

119.     On August 4, 2017, the University filed Respondent's Request for Status Conference as it wished to obtain the right to reinstitute administrative proceedings without limitation, thus expanding its rights.

120.     On August 7, 2017, Doe filed his Response to Respondent's Request for Status Conference, reminding the Court that Doe's writ petition challenged the findings and determination related to only one allegation and that the University's Appeal Body had already determined that there was no evidence to support the initial findings regarding the other allegations. As such, if the matter was remanded, the University should be limited to a rehearing on the issue of physical abuse only.

121.     On August 8, 2017, Doe filed Petitioner's Opposition to Respondent's Motion to Quash Petitioner's Requests for Discovery; Declaration of Mark M. Hathaway, advising the Court that the discovery requests were limited to seeking the evidence the University intended to rely upon to support its Affirmative Defenses and reminding the Court of the University's failure to provide evidence during the administrative proceedings.

### 1.   *Regents Seek To Confess Judgment In Favor Of Plaintiff*

122.     On October 4, 2017, the University filed Respondent The Regents of the University of California's Confession of Judgment, again seeking authority to reinstitute proceedings on charges against Plaintiff that the University had already found to be unsupported by evidence.

123.     It appears that the Confession of Judgment was filed because the University did not want a Court to review the extensive evidence of malicious conspiracy between John Roe and Jane Roe, the negligence and false statements by Title IX investigator Tierney Anderson, and the University's absolute failure to protect John Doe in its quest to find all Title IX accused respondents responsible for violations of the University's new SVSH policy. The evidence of the conspiracy, covered up by Defendants, revealed that they were creating a cover-up for their own malfeasance in the laboratory. The evidence as set forth above, sowed that the University knew (or should have known had it reviewed the evidence) that the allegations against Plaintiff were false, yet did nothing but sanction John Doe. It was in the University's best interest to keep this matter out of the courts.

124.     Also on October 4, 2017, the University filed a Memorandum of Points and Authorities in

Support of Respondent The Regents of the University of California's Confession of Judgment, arguing to the Court that Doe should be required to accept the Confession of Judgment. In so doing, the University set forth the contents of settlement discussions between Doe and the University.

125.    The University filed the Administrative Record on October 4, 2017 but omitted to include necessary audio files.

126.    The University included the audio files on October 5, 2017.

127.    The University filed Respondents' Reply in Support of Motion to Quash Petitioner's Requests for Discovery on October 9, 2017.

128.    On October 16, 2017, the Court set a briefing schedule for Doe to respond to the University Confession of Judgment and granted the University's Motion to Quash.

129.    On October 30, 2017, Doe filed Petitioner's Memorandum Re Respondent's Confession of Judgment.

130.    On November 8, 2017, the University filed Respondent's Reply in Support of Respondent The Regents of the University of California's Confession of Judgment. If the University had put as much effort into investigating John Doe's matter as it did in attempting to keep the matter from being fully decided by a court, the matter would have ended in the investigation stage and John Doe would not have been overly damaged.

### 2. *Judgement Entered Against Regents and in Favor of Plaintiff.*

131.    On January 4, 2018, by agreement of the parties, the Court entered a Judgment granting the Petition for Writ of Mandamus.

132.    The University, in retaining its right to re-institute the administrative proceedings but failing to do so, held John Doe hostage in an administrative limbo, whereby he could not exhaust his administrative remedies and could not seek any other remedy.

### III. REGENTS INITIATE SECOND TITLE IX INVESTIGATION AGAINST PLAINTIFF ON THE SAME DAY REGENTS STEP IN TO DEFEND JOHN ROE AND JANE ROE AND FILE ANTI-SLAPP MOTION

133.    On January 22, 2018, Plaintiff filed his Complaint For Damages For Malicious Prosecution And Abuse Of Process seeking recovery from defendants John Roe and Jane Roe. (John Doe v. Jane

Roe

134. On March 27, 2018, the University of California Office of the General Counsel and the law firm Munger, Tolles & Olson LLP filed the Special Motion To Strike Pursuant To C.C.P. § 425.16 on behalf of defendants John Roe and Jane Roe, and against Plaintiff.

135. That same day, March 27, 2018, the University initiated a new administrative investigation into the same charges that had been dismissed by the Appeal Panel and ordered set aside in the Writ of Mandamus matter. That second Title IX investigation was eventually closed over a year later on September 30, 2019 without any formal administrative action.

## IV. RESEARCH MISCONDUCT, STUDENT CONDUCT, AND NATIONAL SCIENCE FOUNDATION INVESTIGATIONS

136. In addition to Defendants' first Title IX investigation that ran from approximately February 2016 to January 2017 and second Title IX investigation that ran from March 27, 2018 to September 30, 2019, on May 20, 2016 James W. Hicks Ph.D., Interim Vice Chancellor for Research, initiated a Research Misconduct investigation against Doe as UCI Case #160419. The Research Misconduct Investigation #160419 was conducted by: Simon A. Cole, Professor of Criminology, Law and Society; Frederick J. Ehlert, Professor of Pharmacology, Anatomy & Neurobiology; David J Frank, Professor, Sociology; Michele B. Goodwin, Chancellor's Professor of Law; and Jill Yanago Kay, Director, Research Policy.

137. Even though Profs. Cole, Ehlert, Goodwin, Frank, and Director Kay eventually determined that Plaintiff was not responsible for research misconduct, they recommended to the National Science Foundation the most severe sanctions imaginable - government-wide debarment; termination of support from any active awards; prohibition from working under any other Federal Awards; and expulsion from UCI. Such sanctions would have ended Plaintiff's entire education, career, and future in scientific research. The National Science Foundation rejected the recommendation.

138. Regents also instigated a Research Misconduct investigation at National Science Foundation ("NSF"), which did not find research misconduct.

139. In February 2018, after the UCI and NSF research misconduct investigations failed to find Plaintiff responsible for research misconduct, UCI referred the research misconduct charges to the UCI

Office of Academic Integrity and Student Conduct.

140.    On June 29, 2018, Holly Hare, Associate Dean of Academic Integrity & Student Conduct, initiated another investigation against Plaintiff based upon the Investigation Report for Research Misconduct in Case #160419.  Eventually Associate Dean Hare stopped communicating with Plaintiff, but the investigation was never officially closed.

141.    March 27, 2018, Regents had initiated a second Title IX investigation against Plaintiff into the same charges that had been set aside by the judgment on Plaintiff's writ of mandate.

142.    On September 30, 2019, Suzanne Taylor, Systemwide Title IX Director for the University of California, notified Plaintiff that "it is now appropriate to administratively close the [second Title IX] investigation."

143.    At a minimum UCI was required to 1) "ensure the Title IX rights of the complainant," but "accord due process to both parties involved,"(2) provide an "adequate, reliable, and impartial investigation"; (3) provide the complainant and the accused student "an equal opportunity to present relevant witnesses and other evidence"; (4) ensure that the "factfinder and decision maker . . . have adequate training or knowledge regarding sexual violence" ; and (5) require "documentation of all proceedings, which may include written findings of fact, transcripts, or audio recordings."

144.    Regents has failed on almost every point.

145.    Plaintiff has a vested fundamental right under Title IX, that Plaintiff, as well as any similarly situated student, may not be deprived of access to educational programs and activities through an administrative process that does not afford dues process, is not fair, impartial, reliable, and equitable or is overly punitive and not remedial.[30]

146.    UCI's administrative process affected Plaintiff's vested fundamental right to complete his doctoral degree and his fundamental rights under Title IX.

147.    During the pendency of open administrative actions, an accused student, such as Plaintiff, has no legal recourse against the university.  The doctrine of exhaustion of administrative and judicial remedies precludes an action by a university student unless the student first challenges the final administrative decision through a petition for writ of mandamus under Code Civ. Proc., § 1094.5. (*Doe*

---

[30] See, Questions and Answers on Title IX and Sexual Violence, OCR, April 29, 2014, p. 29

COMPLAINT FOR DAMAGES

29

*v. University of Southern California* (2016) 246 Cal.App.4th 221, 237 fn.9; *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722–1723.)

148.    Doe has now exhausted all administrative remedies and avenues for relief prior to bringing this litigation.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (Defendant Regents)

149.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

150.    It is well established that the basic relationship between a student and a university is contractual in nature. *Kashmiri v. Regents of Univ. of California,* 156 Cal. App. 4th 809 (2007), *as modified* (Nov. 15, 2007), *as modified* (Nov. 28, 2007). "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created...." *Id. (internal citations omitted).*

151.    Although "[c]ourts have applied contract law flexibly to actions involving academic and disciplinary **decisions** … [c]ourts have, however, not been hesitant to apply contract law when the educational institution makes a specific promise to provide an educational service." *Id.* at 825 (emphasis added).

152.    Regents' investigative process is controlled by written policies and procedures as set forth above.

153.    At all times relevant hereto, a contractual relationship existed between Regents and Plaintiff through Regents' policies and procedures governing the student disciplinary system.

154.    Through the documents they publish and provide to their students, Regents makes express contractual commitments to students involved in the disciplinary process.

155.    Specifically, through SVSH, Defendant Regents promised that it did not tolerate "discrimination based on sex, gender, gender identity, gender expression, sex- or gender-stereotyping, and sexual orientation violates law and other University policies."

156.    Regents' Title IX Coordinator must coordinate compliance with Title IX; VAWA/Campus

SaVE Act; and other related state and federal laws prohibiting Discrimination, Harassment and Retaliation based on Gender or sex, including Sex Discrimination, Sexual Harassment, Sexual Misconduct, Domestic Violence, Dating Violence, and Stalking. (See University of California, Irvine Student Adjudication Model for Sex Offenses and Sexual Harassment.)

157.   The SVSH Policy also sets forth Defendant Regents promise that the "investigation shall be completed promptly, typically within 60 business days of its initiation, unless extended by the Title IX Officer for good cause followed by written notice to the Complainant and Respondent of the reason for the extension and the projected new timeline."

158.   Through UCI's local Student Adjudication model for Sex Offenses and Sexual Harassment, UCI further promises that, "The Title IX Officer will oversee the investigation and will designate an investigator to conduct a fair, thorough, and impartial investigation."

159.   The UC Policy on Student Conduct and Discipline promises, "Students who allegedly violate the University's standards of conduct will be afforded basic standards of procedural due process," including "[n]otice to the accused of the charges and evidence" and an "[o]pportunity of the accused to respond to the evidence."

160.   The SVSH policy and the other policies set forth above are/were available for review by students and/or potential students on Regents' website.

161.   Regents further created an implied promise to its potential students and students, including Plaintiff, that so long as a student abides by Regents' policies and procedures, completes all necessary degree requirements, and attains satisfactory grades, the student will graduate on his/her expected graduation date. Regents has specific degree requirements listed on the website for each academic program, which is accessible to students and prospective students. Regents further created an implied promise to its potential students and students, that they would be treated fairly in all disciplinary and administrative proceedings.

162.   At all relevant times, Plaintiff was aware of Regents' policies, procedures, and promises as set forth above.

163.   Plaintiff applied to and chose to enroll in Regents, more specifically, University of California, Irvine for which all associated tuition, fees, and expenses were paid in exchange for a

commitment to his academic program.

164.    Plaintiff did so in reliance on his understanding, and with the reasonable expectation that Regents would adhere to its stated policies, including its policies related to the adjudication of misconduct matters as set forth above, and would implement and enforce all of its policies as set forth in its official publications, including those listed on its website.

165.    Plaintiff abided by all Regents policies and procedures, took all necessary courses, and attained satisfactory grades.

166.    Plaintiff did so in reliance upon the promise of a degree and diploma upon completion of the degree requirements for his chosen major.

167.    Based on the foregoing, Regents and Regents created express and implied contracts with Plaintiff.

168.    Plaintiff fulfilled and performed his contractual duties to Regents under the University's policies by providing Regents with required tuition and fees, enrolling in, and attending classes and completing research and work assignments at all times during when events in this Complaint occurred. Plaintiff, to the extent permitted by Defendants, participated in the investigation and reviewed evidence, presented witnesses on his own behalf, supported his own allegation of sexual assault, and showed the falsity of the allegations against him.

169.    Regents breached the terms of its agreement as set forth above when it treated Doe differently based solely upon his gender.

170.    Regents breached the terms of its agreement when it failed to provide Plaintiff a fair, thorough, and impartial investigation and adjudication.

171.    Regents promised Plaintiff that his claim and the claim against him would be conducted by a neutral/unbiased factfinder. Regents breached that agreement when it assigned Tierney Anderson to investigate Jane Roe's claims, as she was not a neutral/unbiased factfinder.

172.    Regents breached its agreement with Doe when it accepted Tierney Anderson's determination, which was not based upon the preponderance of the evidence.

173.    Regents breached its agreement with Plaintiff when it failed to afford Plaintiff the basic standards of procedural due process, including notice of the charges and evidence and an opportunity to

respond to the evidence.

174.    Regents breached its agreement with Doe when it held a sanctions hearing in which the outcome was pre-determined.

175.    Regents further breached the agreement by imposing on Doe the harshest sanction possible, expulsion from UCI, when the evidence did not support Tierney Anderson's findings.

176.    Regents breached its contract with Doe by failing to provide Doe due process before expelling him from Regents in June 2018.

177.    Regents breached its agreement with Doe when it permitted the investigation into the complaint against him to linger well beyond the 60 business day time limit and failed to alert Plaintiff to any extensions for good cause.

178.    In addition to violating the terms of its own Policies, Regents violated the covenant of good faith and fair dealing implied in every contract, which implicitly guaranteed that any proceedings would be conducted with due process and fairness.

179.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff.

180.    Defendant Regents committed multiple breaches of its agreements with Plaintiff during the investigation and adjudication process, including, without limitation, discriminating against Plaintiff based upon his gender; holding Plaintiff to a different standard than the female complainant, Jane Roe; manipulating the evidence; expelling Doe despite no showing of any hostile environment on campus; not holding a hearing where the reporting party could be examined; and holding a sanctions hearing in which the outcome was pre-determined.

181.    Plaintiff has suffered and continues to suffer the loss of enjoyment of his experience as student as a result of the unreasonable delay and the interference with his right to participate in his educational programs and activities at Regents.  Plaintiff also suffered as he rejected offers by other universities when he accepted Regents' offer.

182.    Regents' administrative process affected Doe's right to complete his degree and his fundamental rights under Title IX for access to his education programs and activities.

183.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained

damages, including, without limitation, reputational damage, loss of educational and career opportunities, economic injuries, counsel fees, court costs, and other direct and consequential damages.

184.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## SECOND CAUSE OF ACTION
### Promissory Estoppel
### (Defendant Regents)

185.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

186.    Regents and Regents' various policies constitute representations and promises that Regents should have reasonably expected to induce action or forbearance by Plaintiff.

187.    Regents expected or should have reasonably expected Plaintiff to accept its offer of admission, incur expenses, and choose not to attend other colleges based on its express and implied promises that Regents would not discriminate against Plaintiff and would not deny him his procedural rights should he be investigated for an alleged violation of the University's policies.

188.    Plaintiff relied to his detriment on these express and implied promises and representations made by Regents.

189.    Based on the foregoing, Regents is liable to Plaintiff based on estoppel.

190.    As a direct, reasonable and foreseeable consequence of these breaches, Plaintiff sustained damages, including without limitation, reputational damage, loss of educational and career opportunities, economic injuries, counsel fees, court costs, and other direct and consequential damages.

191.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## THIRD CAUSE OF ACTION
### Violation of Title IX
### (Defendant Regents)

192.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

193.    "Title IX prohibits all discrimination on the basis of sex." *Sheppard v. Visitors of Va. State*

*Univ.*, 993 F.3d 230 (4th Cir. 2021).

194.    Defendant Regents unlawfully expelled Doe because of his male gender.

195.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

196.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Regents.

197.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).

198.    In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

199.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "[accord] due process to both parties involved..." (*Id.* at 22.)

200.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

      a.  "Notice . . . of the procedure, including where complaints may be filed";

      b.  "Application of the procedure to complaints alleging [sexual] harassment...";

      c.  "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

      d.  "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

      e.  "Notice to the parties of the outcome of the complaint…" (*Id.* at 20.)

201.    A school also has an obligation under Title IX to ensure that all employees involved in the

investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" (*Id.* at 20.) Further, Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." (April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.)

202.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

203.   A plaintiff need only allege facts that raise a plausible inference of discrimination on the basis of sex.  (*Schwake v. Ariz. Bd. of Regents* 967 F.3d 940, 947 (9th Cir. 2020).)

204.   Challenges to university disciplinary proceedings for sex discrimination typically fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

205.   An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was an innocent victim who was wrongly found to have committed a violation of Regents' policies, and gender bias was a motivating factor.

206.   To succeed on an erroneous outcome claim, a plaintiff must allege sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and a particularized causal connection between the flawed outcome and gender bias.

207.   In other words, the Plaintiff must demonstrate that there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff; and (3) specific circumstances suggesting gender bias led to the erroneous outcome.

208.   Plaintiff has sufficiently alleged that the proceeding led to an erroneous outcome that was adverse to Plaintiff as set forth above.

209.   Evidence of gender bias can include external pressures, internal pattern and practice, and

facts specific to the instant case.

**FOURTH CAUSE OF ACTION**
**Violation of California Civil Code, § 51**
**(Defendant Regents)**

210.    John Doe repeats and realleges each and every allegation herein above as if fully set forth herein.

211.    The California Civil Code § 51, also known as the Unruh Civil Rights Act provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

212.    Regents is a "business establishment" within the meaning of California Civil Code, § 51. Upon information and belief, Regents maintains physical facilities, employs a significant number of paid faculty and staff, provides an education and academic experience to students, receives applications for admission from the general public, receives tuition payments and fees from its students and is governed by the Regents of the University of California.

213.    Regents denied Plaintiff the advantages, facilities, privileges and services afforded to students of Regents by, among other things: conducting an investigation and adjudication process biased against the male accused; failing to afford John Doe the rights enumerated in its own guidelines and policies; failing to utilize the requisite preponderance of the evidence standard; and assessing a sanction that was disproportionate and unwarranted in light of the circumstances.

214.    Regents intentionally engaged in the following discriminatory acts or practices against John Doe as the male accused: Regents subjected John Doe to disciplinary action in an arbitrary and capricious way, deprived him of due process, and discriminated against him on the basis of his male sex.

215.    Based on the foregoing facts and circumstances, Regents engaged in unlawful discriminatory practices in violation of California Civil Code, § 51.

216.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, reputational damage, emotional distress, psychological damages, loss of educational and career opportunities, economic injuries, counsel fees, court costs, and other

COMPLAINT FOR DAMAGES
37

direct and consequential damages.

217.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### FIFTH CAUSE OF ACTION

#### Negligence
#### (Defendant Regents)

218.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

219.    In order to state a negligence claim under California law, a plaintiff must show that the defendant owed the plaintiff a duty, defendant breached that duty, and such breach was the proximate cause of plaintiff's damages.

220.    California courts have recognized the "special relationship" that exists between a university and its students, which gives rise to a duty of care "while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 624-625.)

221.    Here, Defendant Regents formed a university-student relationship with Plaintiff and owed him a duty to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict, and to ensure proper training to those responsible for investigating and adjudicating the alleged policy violations.

222.    Such duties arise from Regents' relationship with Plaintiff, as a student of the University, an obligation acknowledged by Regents' policies.

223.    The foregoing duties were breached when Plaintiff did not receive the full protections of the disciplinary process, and when he was subjected to biased, defective and flawed procedures and an improper decision unsupported by evidence.

224.    Plaintiff suffered injuries as a direct result of Defendant's breach of the duties owed to him as a student of Regents, including loss of educational and career opportunities, economic losses, emotional and reputational damages.

225.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.  On the First Cause of Action for Breach of Contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

2.  On the Second Cause of Action for Promissory Estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

3.  On the Third Cause of Action for Violation of Title IX, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

4.  On the Fourth Cause of Action for violation of California Civil Code, § 51, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

5.  On the Fifth Cause of Action for Negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

6.  For reasonable attorney's fees incurred by Plaintiff as permitted by statute or contract;

7.  For costs of suit incurred by Plaintiff; and

8.  For such other and further relief as the court deems proper.


                                    HATHAWAY PARKER

Dated: September 29, 2021          By:  _____.
                                        MARK M. HATHAWAY
                                        JENNA E. PARKER
                                        Attorneys for Plaintiff

**JURY DEMAND**

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.

HATHAWAY PARKER

Dated: September 29, 2021      By: _____.
                                    MARK M. HATHAWAY
                                    JENNA E. PARKER
                                    Attorneys for Plaintiff